Taylor M. Hennessey
Assistant Attorney General
1116 West Riverside Avenue, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

THE HONORABLE MARY K. DIMKE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ROBERT THEODORE KINNUNE,<br><br>                         Plaintiff,<br><br>vs.<br><br>STATE OF WASHINGTON, WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES,<br><br>                         Defendants. | NO.  2:23-cv-00026-MKD<br><br>**DECLARATION OF ERICK C. WEST, M.A.** |

ERICK C. WEST declares as follows:

1.     I am over the age of 18 years and I am competent to make this declaration.  I have personal knowledge of the facts stated below.

2.     I am a forensic economist that has specialized in the quantification of commercial and personal economic loss since 2003.  I received a Bachelor of Arts in Economics in 1998, and a Master of Arts in Economics in 2000, both from Washington State University.

3.     I have been the President of West Economics, Inc. since its inception in January 2013.  Over the past 21 years, I have provided valuation services for

**DECLARATION OF**
**ERICK C. WEST, M.A.**

1

1  individuals and businesses on more than 1,800 cases in a litigation context.  I

2  have testified at trial and/or deposition more than 150 times in both state and

3  federal courts.  ECF No. 33, 28-33 is a true and correct copy of my Curriculum

4  Vitae.

5  4.    In my general scope of work as a forensic economist, I frequently

prepare detailed tax calculations and/or take into consideration certain known tax

6  exemptions that are applicable and relevant to the subject case in order to prepare

7  a complete economic loss analysis.  It is not the role of a forensic economist to

8  audit tax returns and/or to provide tax law opinions to suggest that a plaintiff's

9  tax preparer may have missed a tax deduction in prior years.

10  5.    I am not a Certified Public Accountant, nor have I ever represented

to be a CPA.  I have also never represented to be an expert in tax law in this case

11  or any of the other 1,800+ cases that I have worked on in my career.

12  6.    Courts have previously relied on my tax calculations for awarding

13  damages. For example, in the Findings of Fact and Conclusions of Law in *Kelly*

14  *O'Kell vs. Deb Haaland*, in the Eastern District of Washington, I provided

15  testimony pertaining to my detailed tax calculation on behalf of the Plaintiff.

16  Attached as Exhibit 1.  The Judge stated that my analysis was "thorough and

credible."  In addition to accepting every other category of damage that I testified

17  to in that case, the Judge awarded the Plaintiff my detailed calculation of

18  $386,912 in adverse taxes.  A calculation that takes into account an understanding

19  of the plaintiff's taxable income, appropriate tax bracket, and projected tax

20  savings associated with lower mitigation earnings for several years into the

21  future.

22  7.    In *Kingston v. IBM* in the Western District of Washington, the Judge

**DECLARATION OF
ERICK C. WEST, M.A.**

2

awarded my detailed tax calculation of $1,117,508 – further supporting the acceptance of my qualifications and experience in performing detailed tax calculations in the overall scope of the economic damage analysis. A copy of this order is attached at Exhibit 2.

8.    I was retained by the Defendant in the subject case to perform an independent analysis and investigation for expert economic opinions pertaining to the lost wages and benefits being claimed by the Plaintiff, Mr. Robert Kinnune. I was also asked to provide a rebuttal analysis of the report that was prepared by the Plaintiff's damage expert, Dr. Christina Tapia.

9.    The role of an economic expert is to provide opinions of the damages sustained by a plaintiff, if any, that can be stated with reasonable economic certainty and are based on reliable data sources and generally accepted methodologies. In other words, the amount of compensation, as stated at present value, that would make the plaintiff economically whole should he prevail on the allegations being made. Calculating taxes is generally recognized as a necessary component of the role of an economic expert opining on economic damages.

10.    My analysis of Mr. Kinnune's economic damages included a detailed analysis and comparison of his pre-termination wages at the Eastern State Hospital (ESH) in comparison to the wages he has received from his mitigation employer, Spokane County Chaplaincy Services (aka Christian Outreach). My calculations are based on Mr. Kinnune's payroll records, not speculation.

11.    I reviewed payroll records detailing Mr. Kinnune's wages earned during each and every payroll period that he was employed at ESH from October 2016 until his voluntary leave of absence in September 2020

**DECLARATION OF**
**ERICK C. WEST, M.A.**

3

1 | (KINNUNE02020101-123).

2 |     12.    In every single pay period, Mr. Kinnune's wages from ESH were

3 | subject to the mandatory employee contributions towards Medicare and Social

4 | Security, also known as payroll taxes.

5 |     13.    Mr. Kinnune produced his personal tax returns for the years 2018-2022 (KINNUNE_21901-21917).  For the years that Mr. Kinnune worked for

6 | ESH, the tax returns support that Mr. Kinnune's entire ESH salary was subject

7 | federal income taxes.

8 |     14.    Mr. Kinnune began working for Christian Outreach in October

9 | 2020.    Mr. Kinnune's 2021 W-2 Statement from Christian Outreach

10 | (KINNUNE_021962) shows that he earned a total of $67,144, which included

11 | $17,854.87 in wages (27% of total) and $49,289.13 in a housing allowance (73% of total).

12 |     15.    The 2021 W-2 confirms that only his wages were subject to the

13 | mandatory payroll tax of 7.65%, as Mr. Kinnune paid $1,107.00 towards Social

14 | Security (6.2% of $17,854.87) and $258.90 towards Medicare (1.45% of

15 | $17,854.87).  Mr. Kinnune's 2021 housing allowance was exempt from the 7.65% payroll tax.

16 |  

17 |     16.    Mr. Kinnune's 2021 personal tax return (KINNUNE_021914) shows that only his wages of $17,855 were subject to federal income taxes.  Mr.

18 | Kinnune's 2021 housing allowance was exempt from the calculation of his

19 | federal income tax liability.

20 |     17.    Mr. Kinnune's 2022 W-2 Statement from Christian Outreach

21 | (KINNUNE_021963) shows that he earned a total of $88,024.63 which included

22 | $28,914.45 in wages (33% of total) and $59,110.18 in a housing allowance (67%

**DECLARATION OF
ERICK C. WEST, M.A.**

4

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA  99201-1106
(509) 456-3123

1    of total).

2    18.    The 2022 W-2 confirms that only his wages were subject to the

3    mandatory payroll tax of 7.65%, as Mr. Kinnune paid $1,792.70 towards Social

4    Security (6.2% of $28,914.45) and $419.26 towards Medicare (1.45% of

5    $28,914.45).    Mr. Kinnune's 2022 housing allowance was exempt from the

     7.65% payroll tax.

6    19.    Mr. Kinnune's 2022 personal tax return (KINNUNE_021916)

7    shows that only his wages of $28,914 were subject to federal income taxes.    Mr.

8    Kinnune's 2022 housing allowance was exempt from the calculation of his

9    federal income tax liability.

10   20.    Mr. Kinnune's 2023 payroll records from Christian Outreach

11   continue to show that his housing allowance is exempt from payroll taxes

     (7.65%) and federal income taxes.

12   21.    Documentation that is generally recognized as reliable sources of

13   data by economic damage experts, such as tax returns, W-2 statements, and

14   payroll records, confirm that Mr. Kinnune's ESH salary was subject to federal

15   taxes and payroll taxes, while only a small percentage of his Christian Outreach

     income is subject to the same taxes.

16   22.    There is a clear economic benefit to Mr. Kinnune resulting from the

17   fact that the majority of his mitigation earnings are exempt from federal and

18   payroll taxes.    In other words, his current cash compensation that is designated

19   as a housing allowance by his employer is not directly comparable to his salary

20   with ESH.

21   23.    In order to properly calculate Mr. Kinnune's damages, as a result of

22   his allegations in this case, the premium value associated with the fact that his

**DECLARATION OF
ERICK C. WEST, M.A.**

5

current employer designates more than two-thirds of his income as a housing allowance must be taken into consideration. In other words, every $1 that Mr. Kinnune receives as a housing allowance on his paycheck is economically worth more than every $1 he previously earned at ESH. Given that more than two-thirds of his mitigation income is directly paid to him as a housing allowance, this results in a substantial economic benefit to Mr. Kinnune. I have accounted for this premium value in two ways.

24.    First, I have deducted the required 7.65% in payroll taxes from Mr. Kinnune's ESH wages and his Christian Outreach wages. This percentage is comprised of the employee's mandatory 6.2% contribution towards Social Security and 1.45% mandatory contribution towards Medicare. The payroll tax rate of 7.65% has been in effect for the past 33 years since 1990; therefore, it is reasonable to assume that this rate will continue into the foreseeable future. No deduction has been applied to the Christian Outreach income designated as a housing allowance because, as confirmed by the payroll records, this income is exempt from payroll taxes.

25.    Second, I have relied on Mr. Kinnune's personal tax returns in order to compute the effective federal tax rate applicable to his ESH wages and his Christian Outreach wages. This is a methodology that I have used in *hundreds* of employment cases over the past 21-years in order to calculate a plaintiff's effective tax rate. No deduction for federal income taxes has been applied to Christian Outreach income designated as a housing allowance.

26.    The purpose of making these two adjustments is to make Mr. Kinnune's ESH wages directly comparable to his Christian Outreach wages, in order to determine the amount of damages, if any, that he has sustained.

**DECLARATION OF
ERICK C. WEST, M.A.**

6

27.    Plaintiff's counsel has made various assertions in an attempt to limit my testimony in this case. It is stated on page 10 of the Motion:

> *Here, West's opinion necessarily requires him to testify*
> *to the legal conclusion that Kinnune was not entitled to*
> *the clergy housing allowance exemption at ESH.*

28.    This statement is disingenuous for several reasons. I am not providing any tax law opinions in this case, nor do I represent anywhere in my report that I am providing such opinions. My economic expert opinions in this case are based on the reliable data sources that I have cited such as Mr. Kinnune's own payroll and tax records. Data sources confirming that it is an undisputed *fact* that Mr. Kinnune's salary at ESH was subject to federal and payroll taxes during the entirety of his employment from 2016-2020. Data sources that confirm it is also an undisputed *fact* that less than one-third of Mr. Kinnune's Christian Outreach income is subject to federal and payroll taxes.

29.    On one hand, Plaintiff's counsel is asserting that, "West lacks the requisite data and expertise related to taxation issues." However, on the other hand, the Plaintiff is asserting that, only *after* receiving my report, he has since asked his tax preparer to "investigate" whether he may have possibly been able to claim a housing allowance deduction while employed at ESH, and, if so, amend his past tax returns. By making this request to his tax preparer, Mr. Kinnune is acknowledging the premium economic value of his current compensation structure in comparison to his former ESH wages. A premium value that has been fully accounted for in my economic loss analysis.

30.    It is not the role of an economic damage expert to speculate that a plaintiff's historical tax returns may have been incorrectly prepared. If Mr.

**DECLARATION OF**
**ERICK C. WEST, M.A.**

7

Kinnune's tax returns are amended <u>and</u> it is confirmed that he is entitled to a refund of prior federal income taxes and payroll taxes based on some currently unknown percentage of his ESH wages being reclassified as a housing allowance, then I will certainly update my analysis accordingly. Until then, I have based my analysis and opinions on the Plaintiff's tax returns that have been filed with the IRS under penalty of perjury.

31.    It is also worth noting that, if a portion of Mr. Kinnune's former ESH salary is reclassified as a housing allowance, then additional research and analysis will have to be done to determine the impact of that reclassification on Mr. Kinnune's future PERS 2 pension benefits. In my experience, I have never seen income classified as a tax-exempt housing allowance included as reportable salary compensation in the computation of PERS 2 pension benefits.

32.    Plaintiff's counsel has also taken issue with my reference to the premium economic value associated with Mr. Kinnune's housing allowance as a "fringe benefit" of his employment. In my experience, economists define a "fringe benefit" as being synonymous with any type of calculable benefit that is relevant to the assessment of economic damages.

33.    It is the role of a damage expert to account for all of the compensation and benefits when performing a detailed analysis of a plaintiff's pre-termination versus post-termination earnings. Mr. Kinnune receives an added benefit, or fringe benefit, *directly* from his current employer because Christian Outreach specifically identifies more than two-thirds of his mitigation income as a housing allowance on his payroll records – something that the payroll records confirm was not the case while Mr. Kinnune was working for ESH from 2016 to 2020. The fact that the payroll records confirm that this housing

**DECLARATION OF**
**ERICK C. WEST, M.A.**

8

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA 99201-1106
(509) 456-3123

1  allowance is not subject to any payroll and federal taxes is an added benefit that

2  Mr. Kinnune *directly* receives from his current employer, other than his direct

3  salary or compensation.  As such, this benefit should be accounted for in order to

4  provide a complete and meaningful analysis of Mr. Kinnune's economic
   damages.

5       I declare under the penalty of perjury of the laws of the United States of

6  America that the foregoing statement is true and correct.

7       DATED this _12th_ day of October, 2023 at _Spokane_, Washington.

8

9

10  _____
    ERICK C. WEST, M.A.

11

12

13

14

15

16

17

18

19

20

21

22

**DECLARATION OF**                        9
**ERICK C. WEST, M.A.**

**CERTIFICATE OF SERVICE**

I certify that I electronically filed this document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> James W. Beck
> Janelle E. Chase Fazio
> Eric D. Gilman
> Beck Chase Gilman PLLC
> 705 S. Ninth Street, Suite 305
> Tacoma, WA 98405
> (253) 289-5104
> James@bcglawyers.com
> Janelle@bcglawyers.com
> Eric@bcglawyers.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 12 day of October, 2023, at Spokane, Washington.

> ROBERT W. FERGUSON
> Attorney General
>
>
> ___s/ Taylor Hennessey_____
> TAYLOR M. HENNESSEY, WSBA No. 54135
> Assistant Attorney General
> 1116 W. Riverside, Suite 100
> Spokane, WA 99201-1106
> 509-456-3123
> Taylor.Hennessey@atg.wa.gov

**DECLARATION OF
ERICK C. WEST, M.A.**

ATTORNEY GENERAL OF WASHINGTON
Torts Division
1116 West Riverside, Suite 100
Spokane, WA  99201-1106
(509) 456-3123

RE: *Kinnune v. State*
   **Cause No. 2:23-cv-00026-MKD**

# EXHIBIT 1

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Apr 12, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KELLY O'KELL,<br><br>          Plaintiff,<br><br>          v.<br><br>DEB HAALAND, in her official capacity<br>as Secretary of the United States<br>Department of the Interior,<br><br>          Defendant. | No. 2:18-CV-00279-SAB<br><br>**FINDINGS OF FACT AND**<br>**CONCLUSIONS OF LAW** |

A bench trial was held in the above-captioned matter in Spokane Washington from November 1-5, 2021; February 14-18, 2022; and concluded on February 23, 2022. Plaintiff was represented by Matthew Crotty and Michael Love. Defendant was represented by John Drake, Joseph Derrig, and Molly Smith.

Having fully reviewed the materials submitted by the parties and the record in this matter, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

### Findings of Fact

1.    In July 2014, Plaintiff Kelly O'Kell was hired by the Bureau of Reclamation ("Bureau"), a federal agency under the U.S. Department of the Interior, as a Realty Specialist. She was hired at the GS-11 level.

2.    Plaintiff worked in the Bureau's Ephrata Field Office ("EFO").

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 1

3.      From July 2014 through May 25, 2016, Plaintiff received no disciplinary actions, and there were no behavior issues reported by any of her co-workers. During this time, she received regular pay raises, cash bonuses, and excellent performance reviews. Plaintiff also received cash bonuses, pay raises, and positive performance evaluations after May 2016, which is inconsistent with the testimony of her supervisors that her performance was unsatisfactory between May 2016 and her termination in 2018.

4.      All of these pay raises, bonuses, cash awards, and positive performance evaluations are inconsistent with the claim made by Defendant that Plaintiff was terminated for performance and behavior issues.

5.      From July 2014 through May 25, 2016, Plaintiff was never told by her supervisors that her emails were inappropriate.

6.      During the time that Plaintiff worked at the Ephrata Field Office, there were several discrimination related complaints made by employees there. Some of the complainants, not just Plaintiff, claimed that the managers at the EFO used phrases such as "we need young blood" or "we need to bring in a new generation" or "when are you planning to retire" or "older workers don't go with the flow." Approximately 30-40 discrimination complaints were filed by employees of the EFO, most during the time that Plaintiff worked there.

7.      Kathy Hernandez, the former Equal Employment Opportunity ("EEO") Specialist for the Bureau, testified that she worked on approximately 30 complaints from the EFO alone. Asked if she was concerned about the number of discrimination, harassment, and retaliation complaints, Ms. Hernandez said, "Yes, that is a concern. Concern to me, concern to my supervisor."

8.      Dawn Wiedmeier, the Area Manager for the Bureau, was not aware that 30-40 complaints of discrimination were filed involving the managers at the EFO, but she was not concerned by that number. In fact, she thought that this was a good sign because it was evidence that disgruntled employees understood how

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 2

to file complaints. She did not inquire about the nature of the complaints or how they were resolved or even if they were resolved. At trial, she explained that the EFO was an "old boys' network" and she wanted to hire new people and create a new culture within the office. She admitted that she discussed this hiring goal with Clint Wertz, the Field Office Manager for the EFO. Ms. Wiedmeier was Mr. Wertz's supervisor.

9.    At trial, Mr. Wertz testified that he was concerned the EFO was losing experienced people, but this is inconsistent with his actions of favoring new, inexperienced, and younger people, such as Sarah Maciel and Charity Davidson, and his decisions not to promote experienced existing employees such as Plaintiff and Gina Hoff.

10.    Plaintiff claims that Mr. Wertz told her in early 2017 that he would never hire a female over the age of 50.

11.    Additionally, Anthony Ortiz asked Plaintiff several times about her retirement plans, to which she replied, "I have to work another 15-20 years; please stop asking me that." Mr. Ortiz was Plaintiff's direct supervisor at the EFO.

12.    In May 2016, Plaintiff applied for a newly created and vacant Project Manager position at the EFO. This position was rated as GS-11 or GS-12. The person selected for the job would be supervised by Clint Wertz. The new position was advertised as requiring work mostly within the office at the EFO.

13.    Mr. Wertz encouraged Plaintiff to apply for the job and told that she was qualified for the position.

14.    Mr. Wertz was the deciding official for the Project Manager position, meaning that the hiring decision was his alone to make.

15.    Mr. Wertz convened an interview panel to assist him in interviewing the candidates for the Project Manager job. The panel consisted of himself, Toni Turner, and Sarah Maciel.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW # 3**

16.     Two candidates were selected for an interview: Plaintiff and Charity Davidson. Ms. Davidson was younger than Plaintiff and did not work for the Bureau at the time of the interviews.

17.     Plaintiff was 56 years old when she applied for the job. Ms. Davidson was under 40 years old.

18.     Sarah Maciel was a GS-9 at the time she sat on the Project Manager interview panel, which took place in early May 2016. As a GS-9 employee, it would have been unusual for her to be selected as a member of the panel. She did not have previous experience serving on an interview panel.

19.     The interview panel did not use a formal scoring or ranking matrix.

20.     Clint Wertz alone made the choice to hire Charity Davidson. In short, though an interview panel was convened, the hiring decision was made by Mr. Wertz. He did not consult with the panel members when he made his decision.

21.     Mr. Wertz discouraged another older female applicant, Gina Hoff, from applying for a different project manager position in the EFO. At the time, Ms. Hoff already possessed a Project Manager certification along with the GS-12 rank required for the position. Ms. Hoff explained that she planned to apply, but that Mr. Wertz discouraged her and told her she would not get the job.

22.     Mr. Wertz decided not to hire Plaintiff despite several excellent recommendations and an internal reference from Anthony Ortiz, Plaintiff's direct supervisor. Ms. Davidson was hired and was allowed to telework from her home in Wenatchee, even though the job as advertised required working at the EFO.

23.     Both candidates (Ms. Davidson and Plaintiff) had at least one negative reference from previous employers.

24.     On May 19, 2016, Clyde Lay called Plaintiff—who was attending a work-related conference with co-workers in Boise, Idaho—and informed her that she was not selected for the Project Manager position. Mr. Lay was Mr. Wertz's deputy at the EFO. Mr. Lay was not part of the interview panel but called Plaintiff

**FINDINGS OF FACT AND CONCLUSIONS OF LAW # 4**

at the request of Mr. Wertz. Mr. Lay told Plaintiff that she was not "the best fit" for the Project Manager position.

25.    On the same day, Mr. Wertz approved a Star Award for Plaintiff that included the following language: "Kelly has demonstrated a complete knowledge of each facet of realty and has taken on waiver valuation training for eventual certification. Kelly works with other groups within EFO, area and region, to find customer solutions. Kelly has been working successfully in conjunction with operations area to develop and implement improved processes, SOP, between EFO interoffice groups and water districts. The SOP development will benefit all of the EFO and could possibly be a template for other offices in the region. Kelly is an asset to the realty group and remains an example of knowledge, quality, and extra effort for all." Yet, Mr. Wertz still decided to hire the other candidate who had no previous federal employment experience.

26.    Plaintiff attended a dinner that evening with co-workers Sarah Maciel and Corbin Gentzler. According to Plaintiff, Ms. Maciel explained that, although the two candidates were "pretty equal" in qualifications, Mr. Wertz selected Charity Davidson because she would bring new energy to the office. Plaintiff also believed that Ms. Maciel used the phrase "young and perky" to describe Ms. Davidson.

27.    Neither Ms. Maciel nor Mr. Gentzler directly disputed the "young and perky" comments.

28.    Rather, in an affidavit signed on December 15, 2017, Ms. Maciel claimed that she "did not recall" using the phrase "young and perky."

29.    On May 25, 2016, Plaintiff filed an informal EEO complaint related to her non-selection for the Project Manager position, alleging disparate treatment based on sex and age (over 40). EEO Specialist Kathy Hernandez did the counseling intake. EFO management was informed of Plaintiff's complaint the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 5

same day it was made. Plaintiff's managers at the EFO immediately began to treat her differently than before the complaint was made.

30.     On May 31, 2016, Ms. Maciel complained to her supervisor, Anthony Ortiz, that Plaintiff engaged in inappropriate conduct towards her on both April 19, 2016, and May 19, 2016. This was the first time that Ms. Maciel had complained about the incident on April 19—and in fact, one or two weeks after that incident Ms. Maciel had asked Plaintiff to watch her young children for the weekend. No credible explanation was offered regarding (1) why Ms. Maciel was upset about an incident involving Plaintiff on April 19 yet did not report it until May 31 and also (2) why, in the interim, Ms. Maciel asked Plaintiff to babysit her children for an entire weekend.

31.     On June 2, 2016, Mr. Ortiz suspended Plaintiff's teleworking privileges. This came as a surprise to Plaintiff because Mr. Ortiz had authorized her to telework as recently as May 25, 2016, which was before he knew that she was concerned about age discrimination. Plaintiff complained to Dawn Wiedmeier that this action was retaliatory.

32.     On July 21, 2016, Mr. Ortiz issued a Letter of Reprimand to Plaintiff for inappropriate conduct. This was in response to Ms. Maciel's complaint.

33.     On July 27, 2016, Plaintiff sent written objections to the Letter of Reprimand. She also sent an email to Ms. Wiedmeier complaining that the Letter of Reprimand was in retaliation for her filing an informal EEO complaint on May 25, 2016.

34.     On August 24, 2016, Mr. Ortiz upheld the decision to issue the Letter of Reprimand.

35.     On August 25, 2016, Plaintiff filed a formal EEO complaint claiming age discrimination.

36.     The EEO investigation did not begin until almost a year after it was filed, even though it was required to be completed within 180 days. Plaintiff never

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 6

received an explanation for this delay. Her frustration regarding her discrimination related complaints began to grow and fester.

37.    On August 31, 2016, Kathy Hernandez completed the counseling report regarding the EEO complaint filed by Plaintiff. In her notes, Ms. Hernandez quoted Mr. Ortiz as explaining that another management official at the EFO instructed him to punish certain individuals, but he was unwilling to disclose the name of the individual who gave him this order.

38.    On April 28, 2017, Mr. Ortiz encouraged Plaintiff to consider going through the chain-of-command with any issues before contacting the EEO or the Regional Office.

39.    On May 12, 2017, the Bureau issued an acceptance letter for several age discrimination and hostile work environment claims made by Plaintiff, including (a) the decision in May 2016 not to promote her into the Project Manager position; (b) the decision to terminate her telework privileges on June 2, 2016; (c) the decision that she was absent without leave in July 2016; (d) the written reprimand letter issued on July 21, 2016; (e) questions and comments by her supervisor Anthony Ortiz about her age and retirement plans; and (f) rude and unprofessional treatment by co-worker Sarah Maciel.

40.    During the first week of July 2017, Mr. Ortiz and another co-worker were killed in unrelated accidents. The formal EEO investigation regarding Plaintiff's complaints had not yet been started so these witnesses were never interviewed. The EEO investigation process should have been completed by this time.

41.    Following these tragic deaths, tensions in the office escalated.

42.    In late July 2017, Clyde Lay told Plaintiff that "I've got you now." The implication was that he would now be able to terminate Plaintiff because Mr. Ortiz was no longer available to protect her.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW # 7**

43.     On August 9, 2017, the Bureau finally started the EEO investigation regarding Plaintiff's discrimination-related complaints. This was a year after the complaints had been filed, and three months after the Bureau issued the acceptance letter, which essentially determined probable cause to investigate. Defendant did not offer an acceptable explanation for this unreasonable and unacceptable delay. The investigation was assigned to EEO Investigator Michael Brown. It is unclear if Plaintiff was notified of this development. However, August 14, 2017, was a busy day for both Plaintiff and her managers.

44.     On August 14, 2017, Plaintiff sent an email to Regional Director Lorri Lee and alleged ongoing inappropriate treatment, including age discrimination and retaliation.

45.     On August 14, 2017, Kip Stover, a supervisor with the Human Resources department, drafted a letter for Clyde Lay for the purpose of terminating Plaintiff because she sent some emails in July that her managers thought were inappropriate.

46.     On August 14, 2017, Mr. Lay sent an email to Plaintiff and made the following offer: "I would remove the [July 2016 letter of reprimand] from your file if you were to accept a job outside of this office. You would need to bring me a signed acceptance letter and I would have the letter of reprimand removed before you were transferred to another agency or resigned to take employment with a private employer or a state government."

47.     Plaintiff refused that offer.

48.     EEO Specialist Kathy Hernandez later described this offer as unacceptable:

A: I have never seen this [email from Clyde Lay] before… but that is unacceptable.

Q: Why is it unacceptable as an EEOC specialist?

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 8

A: To me, that would be considered *retaliation.* Why would he tell her he would remove that letter if she were to take another job?

49.     On September 13 and 14, 2017, two employees from the Human Resources department, Kip Stover, and Nate Shimatsu, interviewed Plaintiff and other witnesses regarding the complaint Plaintiff made to Lorri Lee on August 14, 2017.

50.     On September 17, 2017, Clyde Lay issued a proposed 3-day suspension letter to Plaintiff. Mr. Stover helped Mr. Lay draft the letter.

51.     On September 21, 2017, Plaintiff submitted written objections to the proposed suspension.

52.     On September 29, 2017, Plaintiff provided a response to the proposed suspension to Carolyn Chad, the Deputy Area Manager. Ms. Chad had final decision-making authority regarding the proposed suspension.

53.     On October 24, 2017, Plaintiff had her annual performance evaluation and received some low ratings because of emails she sent that her supervisors thought were inappropriate.

54.     On October 27, 2017, the Bureau issued an amended acceptance letter for the additional retaliation claims made by Plaintiff in May 2017.

55.     On November 8, 2017, Carolyn Chad upheld the 3-day proposed suspension. Plaintiff served the suspension from November 15-17, 2017.

56.     On February 8, 2018, Michael Brown completed his EEO investigation regarding the complaints filed by Plaintiff in 2016. He issued a report, but he did not issue any findings or conclusions. In fact, Defendant has never issued any findings or conclusions.

57.     On February 8, 2018, Marc Maynard started as the Field Office Manager for the EFO, replacing Clint Wertz. Mr. Maynard did not have any prior

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 9

experience working with Plaintiff, but within a very short period, he started the process to terminate her from federal employment.

58. On February 26, 2018, Karissa Fromm and Barb Gentry, Plaintiff's co-workers, submitted complaints about Plaintiff to Kip Stover.

59. On March 8, 2018, the Bureau hired Hayward Reed, a private investigator, to investigate the complaints filed by Ms. Fromm and Ms. Gentry.

60. On March 14-15, 2018, Mr. Reed interviewed witnesses and gathered affidavits as part of his investigation.

61. On March 18, 2018, Plaintiff discussed concerns she had about workplace harassment and retaliation with Marc Maynard.

62. Mr. Maynard requested follow-up information about Plaintiff's concerns in writing, which she was unable to provide. Instead, on March 30, 2018, Plaintiff responded to Mr. Maynard's information request by email, telling him, "You have all the information you need in the records at your managers' office. … They … refuse to provide me with the allegations that were investigated about me. I do not have the info." Some of the comments in Plaintiff's email were insulting to Mr. Maynard.

63. Mr. Maynard did not respond to Plaintiff's concerns about ongoing age discrimination and retaliation.

64. On March 28, 2018, Hayward Reed issued his fact-finding report.

65. On April 2, 2018, the Human Resources department sent Plaintiff a summary of administrative investigations of her complaints made on August 17, 2017, and October 30, 2017.

66. On April 3, 2018, Plaintiff responded that this investigation summary did not address the EEO crisis in the EFO.

67. On April 11, 2018, Kip Stover sent a copy of the Hayward Reed investigation report to Clyde Lay, Marc Maynard, and others. There is no evidence he sent a copy of the report to Plaintiff.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 10

68.     On May 14, 2018, Mr. Maynard issued a proposed removal letter to Plaintiff. Mr. Maynard claimed that he did not ask others for any input as to whether Plaintiff should be removed from federal service. However, he stated that he did receive a "lot of unsolicited suggestions or advice from a number of people."

69.     On May 22, 2018, Kip Stover and Dawn Wiedmeier exchanged emails about Plaintiff in which Ms. Wiedmeier thanked Mr. Stover for his help in dealing with Plaintiff and noted that "there's a light at the end of the tunnel" regarding the matter.

70.     On June 13, 2018, Plaintiff responded to the proposal removal letter from Mr. Maynard and indicated it did not address her complaints regarding age discrimination and retaliation.

71.     Mr. Maynard did not read Plaintiff's written rebuttal to the proposed removal letter. He explained that it would be inappropriate and unusual for him to do so. He did not explain why it would be inappropriate for him to consider the response from a long-term employee before making a final recommendation to terminate that person's employment.

72.     On July 18, 2018, Dawn Wiedmeier upheld the proposed removal from Mr. Maynard and terminated Plaintiff. She made the decision without consulting with Mr. Maynard. Also, at the time she made the decision, Ms. Wiedmeier thought the EEO investigation into Plaintiff's discrimination complaints had concluded with "no findings." She was wrong. The investigator had not made any findings or conclusions—and no such findings or conclusions have ever been made.

73.     Deborah Diamond is a former EEO Officer for the Internal Revenue Service. Ms. Diamond has conducted investigations of both formal and informal complaints and she has extensive knowledge of federal government human resource policies and procedures. As part of her review of this case, she reviewed

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 11

the relevant pleadings and the material and information exchanged during discovery.

Specifically, Ms. Diamond was asked to evaluate the adequacy of the investigation conducted by the Bureau in response to the discrimination related complaints filed by Plaintiff. Her opinions, which follow, were shared with the Court:

> a.    *The EEO Investigation was not timely.*

The Department of the Interior allowed 349 days to elapse from the date Kelly O'Kell filed a formal EEO complaint to the date an authorization letter was issued to an outside EEO investigator. An additional 183 days elapsed before the Report of Investigation (ROI) was issued. No final decision has been issued to date.

In contrast, when Kelly O'Kell was the Respondent in the harassing-conduct complaints filed by Karissa Fromm and Barb Gentry, the Bureau of Reclamation hired an external investigator within 11 days; a Report of Investigation was issued within 31 days; and a decision (proposed termination of Kelly O'Kell) was issued within 36 days.

> b.    *The EEO Investigation was not impartial.*

In the investigatory interviews for Kelly O'Kell's 08/14/2017 and 10/30/2017 harassing conduct complaints, Kip Stover and Nate Shimatsu asked witnesses about Kelly O'Kell's conduct, as opposed to asking witnesses about whether Kelly O'Kell had been harassed by management based on age or retaliation for protected activity.

The Investigators failed to conduct interviews in a way that would have permitted them to reach an impartial determination on the merits of Kelly O'Kell's discrimination and retaliation complaints.

The Investigators permitted management officials to testify that they "did not recall" saying/doing things that would have been detrimental to

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 12

them. A skilled investigator would have asked the witnesses to explicitly state whether they denied saying/doing what was alleged.

It is significant that several other employees in the Ephrata Field Office filed EEO complaints alleging disparate treatment based on age against the same management officials. A reasonably skilled and prudent investigator would have documented the existence and particulars of these potential comparators.

       *c.*   *The Investigators were not impartial.*

The Bureau of Reclamation's selection of Kip Stover as one of the investigators did not meet complaint procedure assurance that the investigator would be "impartial" and an "uninvolved" Human Resources representative.

Employee and Labor Relations Manager Kip Stover was assisting management in preparing a proposed 3-day suspension of Kelly O'Kell that was issued on the same day (09/14/2017) that she was interviewed by Kip Stover regarding her 08/14/2017 harassment and retaliation complaint against the same management.

Kip Stover was a fact witness and should not have been selected to serve as the investigator. A reasonably skilled and prudent investigator would insist upon interviewing Kip Stover given his role in assisting management with the discipline process.

       *d.*   *The Human Resources Department had a conflict of interest.*

Kelly O'Kell's allegations presented Bureau of Reclamation's Human Resource (HR) department with a potential for a conflict of interest that should have precluded anyone in the department from serving as the investigator of Kelly O'Kell's complaints.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 13

One of the basic duties of any HR representative is to ensure that managers do not engage in unlawful retaliation when disciplining employees.

This was a case for Bureau of Reclamation to hire a neutral, third-party investigator, given that allegations were leveled against managers who were working with HR to discipline and ultimately terminate Kelly O'Kell.

Instead, Kelly O'Kell was issued a proposed 3-day suspension letter (prepared by Kip Stover) the same day she was interviewed by Kip Stover regarding her 08/14/2017 harassing-conduct complaint.

For most human resource professionals, the decision to discipline Kelly O'Kell while the harassment investigation was in progress violates strong prohibitions against retaliation found in Department of the Interior internal policies and the applicable EEO laws.

> *e.      There was evidence of retaliation.*

After Kelly O'Kell complained of age discrimination and filed an informal EEO complaint on 05/25/2016, Anthony Ortiz suspended Kelly O'Kell from teleworking and issued her a Letter of Reprimand dated 07/21/2016.

After Kelly O'Kell complained of age discrimination, retaliation, and harassing conduct to Lorri Lee on 08/14/2017, Clyde Lay issued her a Proposed Suspension letter dated 09/14/2017.

After Kelly O'Kell complained that the agency failed to address her EEO issues in Nate Shimatsu's Investigation Summary and Closeout dated 04/02/2018, Marc Maynard issued her a Proposed Termination letter dated 05/14/2018.

The Investigations did not thoroughly investigate or definitively conclude that management's actions were non-discriminatory or non-retaliatory.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 14

74. Erick West is a forensic economist. Mr. West performed an analysis and investigation regarding the economic damages incurred by Plaintiff after she was terminated by the Bureau.

75. His analysis was thorough and credible.

76. According to Mr. West, Plaintiff incurred the following economic damages:

    a. Past lost wages and benefits from June 1, 2016 (the start date of the Project Manager position) and July 18, 2018 (the date of Plaintiff's termination) - **$15,043**.

    b. Past lost wages and benefits from July 18, 2018 (date of termination) to February 28, 2022 (approximate trial date) - **$337,074**

    c. Future lost wages and benefits to Plaintiff until age 72 (her planned age of retirement) - **$477,561**.

    d. Future lost FERS Pension Benefits - **$220,380**.

    e. Future lost Student Loan Forgiveness Benefits - **$230,113**.

    f. Prejudgment interest - **$16,268**.

    g. Adverse taxes on lump sum award - **$386,912**.

    h. Total loss - **$1,683,351**.

77. Plaintiff testified that she planned to work until age 72 because she needed that time to pay off her student loans and build some savings for retirement.

78. Her testimony regarding retirement plans was credible.

79. At trial, there was some dispute whether the Project Manager position was a GS-11 or GS-12 position. However, the position was advertised as GS-11 *or* GS-12 and the successful applicant, Charity Davidson, was hired and paid as a GS-12. Ms. Davidson had never been a federal employee before, whereas Plaintiff had been a successful federal employee prior to that. Economist Erick West assumed

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 15

and concluded that, if hired, Plaintiff would have been hired and paid at the GS-12 level. Mr. West's conclusion was reasonable.

80.     Plaintiff attempted to mitigate her damages by exercising reasonable care and diligence in seeking re-employment after being terminated. She was unsuccessful and remains unemployed as of the date of trial in February 2022.

81.     The Bureau had a policy of progressive discipline. The decision to terminate Plaintiff in 2018 was based, in part, on the prior discipline imposed in 2016 (Letter of Reprimand) and 2017 (3-day suspension). The 2018 removal decision may have been less severe if the prior discipline had not been imposed.

82.     Plaintiff was specific and consistent regarding her allegations of age discrimination, retaliation, and hostile work environment. In fact, most of her allegations were made in emails contemporaneous to the actual event. But many of the defense witnesses were inconsistent, specifically Clint Wertz and Sarah Maciel. For example, when asked during depositions about specific allegations made by Plaintiff, both Mr. Wertz and Ms. Maciel responded that they did not recall. However, at trial, both witnesses had better memories and denied these same allegations.

### Conclusions of Law

Plaintiff asks the Court to (1) find that Defendant has engaged in age discrimination and retaliation/hostile work environment in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; (2) award back pay, front pay, and all attendant benefits, interest, and tax consequences; (3) award injunctive relief, specifically to remove the termination reasons from Plaintiff's SF-50 and remove the relevant letters of discipline from her personnel file; and (4) award costs and reasonable attorney's fees.

### A.     Age Discrimination

29 U.S.C. §633a of the Age Discrimination in Employment Act ("ADEA") governs age discrimination claims related to federal government employment.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 16

Specifically, the ADEA's federal-sector provision states that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Personnel actions include "most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews." *Babb v. Wilkie*, __ U.S. __, 140 S. Ct. 1168, 1173 (2020).

To prove a claim for age discrimination, a plaintiff must show that she (1) suffered an adverse personnel action; (2) was 40 years old or older at the time of the personnel action; and (3) the adverse personnel action was because of her age. *Shelley v. Geren*, 666 F.3d 599, 607 (9th Cir. 2012).

The U.S. Supreme Court has clarified that a plaintiff does not need to show that age was a but-for cause of the adverse personnel action to show a violation of the ADEA's federal-sector provision. *Babb*, 140 S. Ct. at 1172. However, the plaintiff must show but-for causation to obtain reinstatement, back pay, compensatory damages, or other forms of relief related to the end result of the challenged action. *Id.* at 1177. The plaintiff carries the burden of proving but-for causation, along with the other elements of her claim. *Shelley*, 666 F.3d at 608.

A plaintiff can show age discrimination through direct and/or circumstantial evidence. *See Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004). Direct evidence is defined as "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Id.* (internal citation and quotation omitted).

The parties do not dispute the first two elements of Plaintiff's age discrimination claim—namely that she (1) suffered an adverse personnel action when she did not receive the Project Manager position; and (2) that she was 40

**FINDINGS OF FACT AND CONCLUSIONS OF LAW # 17**

years or older at the time. Thus, the Court will only discuss the third element: whether the adverse employment action in this case was because of Plaintiff's age.

Here, Plaintiff has met her burden in showing that Defendant's failure to select her for the Project Manager position was because of her age. The testimony of Plaintiff and Gina Hoff, both of whom were employees over the age of 40 years old, depicted the EFO as an atmosphere where younger employees were treated differently from older employees. For example, Plaintiff testified that, in early 2017, Clint Wertz, the Field Manager of the EFO, told her that he would never hire a female over the age of 50. Consistent with this testimony, Ms. Hoff also testified that, when a natural resources supervisor position opened up in the office, Clyde Lay, Mr. Wertz's second-in-command, discouraged her from applying and told her that she would not get the job, even though Ms. Hoff already had the requisite certification and GS-level for the position. Finally, Plaintiff testified that Anthony Ortiz, her direct supervisor, asked her several times about her retirement plans even though Plaintiff was only in her 50's, despite Plaintiff repeatedly telling him "Please stop asking me that."

Even testimony from those higher up in the chain of command at the Bureau did not dispel this depiction of an ageist atmosphere. Dawn Wiedmeier, the Area Manager for the Bureau, admitted that she felt that the EFO was an "old boys' network" and that she told her subordinates, including Mr. Wertz, that she wanted to create a "whole new culture" within the office. Ms. Wiedmeier also acknowledged that she was aware there had been 30-40 complaints of discrimination, including complaints of age discrimination, against the managers of the EFO—but that these complaints did not concern her or cause her to inquire into the nature of the allegations.

The Court thus considers Plaintiff's non-selection for the Project Manager position against this backdrop. The evidence presented at trial shows that—from the time Plaintiff was hired by the Bureau in 2014 to the time that she applied for

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 18

and did not receive the Project Manager position in May 2016—she did not experience any behavioral or performance issues. In fact, because of her high-quality work within the office, Plaintiff testified that Mr. Wertz encouraged her to apply for the Project Manager position and told her that she was qualified.

However, Plaintiff was ultimately not selected for the Project Manger position. Defendant offered several explanations for why Plaintiff's non-selection was based on reasons other than her age—however, none of Defendant's explanations are credible. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) ("[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.").

For one, Defendant pointed to a negative reference check from one of Plaintiff's previous supervisors to justify her non-selection. However, Charity Davidson, the candidate selected over Plaintiff, also had a negative reference check from one of her previous supervisors, who indicated that Ms. Davidson sometimes had "difficulty following management direction" and may create conflict if there was a disagreement between herself and management.

Second, Defendant stated that Ms. Davidson was hired because she had more experience than Plaintiff did. However, unlike Plaintiff, Ms. Davidson had no previous federal employment experience. Additionally, Mr. Wertz testified that, during this time, he was concerned about losing institutional knowledge due to the significant amount of employee turnover in the EFO. But, in hiring Ms. Davidson, Mr. Wertz not only chose the candidate with no internal experience, but also permitted Ms. Davidson to telework from her home in Wenatchee, thereby hindering her ability to build up experience within the office.

Finally, Defendant's argument that Ms. Davidson's interview for the Project Manager position was stronger than Plaintiff's is pretext. The evidence presented at trial created an inference that even the interview process was biased. For example, on April 27, 2016, two weeks before the Project Manager interviews

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 19

were scheduled to take place, Mr. Wertz—the hiring official for the position—sent out an email, stating that he wanted to change the members of the interview panel to substitute in Sarah Maciel. At that time, Ms. Maciel was a GS-9 employee who had only started working at the EFO in January 2016 and did not have previous experience serving on an interview panel. Notably, Ms. Maciel was also under 40 years old.

Nate Shimatsu, the Human Resources Manager for the Bureau, testified that it was unusual for a GS-9 employee such as Ms. Maciel to be placed on an interview panel for a position with a higher GS-level, such as the GS-12 Project Manager position. Mr. Wertz's selection of Ms. Maciel to be on the panel for Plaintiff's interview was even more unusual in light of the fact that Plaintiff and Ms. Maciel had just gotten into a verbal altercation the week before, on April 19, 2016. *See Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011) (finding that a plaintiff can create an inference of pretext by showing that, in context, her employer's deviation from established policy or practice worked to her disadvantage).

Not only was Plaintiff's non-selection for the Project Manager position because of her age, but Plaintiff's age was a but-for cause of her non-selection. None of Defendant's proffered explanations for Plaintiff's non-selection are compelling or persuasive. Additionally, Plaintiff presented ample direct and circumstantial evidence to support that Defendant's adverse personnel action was discriminatory based on her age. Finally, even one year after the non-selection, Plaintiff was still receiving pay raises, cash awards, and positive performance ratings for her work at the EFO. Thus, because the evidence in the record shows that (1) Plaintiff was a qualified, high-performing employee both before and even after a year after the non-selection; and (2) there was no legitimate, non-discriminatory reason for choosing Ms. Davidson over Plaintiff, the Court concludes that Plaintiff has established that her age was the but-for cause of her

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 20

non-selection. Accordingly, Plaintiff has successfully shown that Defendant discriminated against her based on age in violation of the ADEA.

**B.    Retaliation**[1]

The ADEA's federal-sector provision also prohibits retaliation against a federal employee who complains of age discrimination. *Gomez-Perez v. Potter*, 553 U.S. 474, 491 (2008). The U.S. Supreme Court noted that "the ADEA federal-sector provision was patterned directly after Title VII's federal-sector discrimination ban." *Id.* at 487 (internal citation and quotation omitted). Thus, cases interpreting Title VII can be used in ADEA retaliation cases and vice versa. *See Hashimoto v. Dalton*, 118 F.3d 671, 675 n.1 (9th Cir. 1997).

In order to show a claim for retaliation, a plaintiff must show that she (1) engaged in protected activity opposing the defendant's age discriminatory practices; (2) suffered an adverse employment action; and (3) the adverse employment action was because of her participation in a protected activity opposing the defendant's unlawful employment practice. *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir. 1987).

An employee's protected activity can encompass both formal and informal complaints. *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000). However, the protected activity must be in opposition to *the employer's* discriminatory practices. *See Silver v. KCA, Inc.*, 586 F.2d 138,

---

[1] Plaintiff's Complaint alleges a "Retaliation & Hostile Work Environment" claim. ECF No. 1 at 12. However, at trial, Plaintiff's counsel clarified that the hostile work environment allegation is only relevant to the second element of Plaintiff's retaliation claim, rather than being its own independent cause of action. Thus, the Court will only address whether Plaintiff has proved the elements of a retaliation claim under the ADEA.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 21

140-42 (9th Cir. 1978) (holding that employee's opposition to a racially discriminatory act of a co-employee cannot be the basis for a retaliation action)

An adverse employment action is defined as "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007) (internal quotation omitted).

Finally, a plaintiff must demonstrate that her protected activity was the but-for cause of her adverse employment action in order to prevail on her retaliation claim. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). Causation can be shown through direct and/or circumstantial evidence, which includes (1) the employer's knowledge of the plaintiff's protected activities; and/or (2) the proximity in time between the protected activity and the adverse employment action. *Yartzoff*, 809 F.2d at 1376.

Here, Plaintiff has met her burden in showing that Defendant's disciplinary actions against her—including its decision to ultimately terminate her employment—were because she made complaints against Defendant's age discrimination and retaliation, both internally and through the EEO process.

Plaintiff began engaging in protected activity immediately after her non-selection for the Project Manager position. On May 23, 2016, Plaintiff contacted the Bureau's EEO office, alleging disparate treatment based on sex and age. Kathy Hernandez, an EEO Specialist, then began looking into Plaintiff's allegations.

Defendant admitted that Plaintiff's managers at the EFO learned on or about May 23, 2016, that she had contacted the EEO. Prior to this date, there was no evidence that Plaintiff had ever been subjected to any disciplinary actions. However, after discovering her protected activity, Defendant started subjecting Plaintiff to adverse employment actions. For example, despite previously approving Plaintiff's telework on May 25, 2016, Mr. Ortiz on June 2, 2016,

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 22

suddenly revoked this approval and instead told her that she was first required to seek his permission to telework.

Also, during the week of May 26, 2016, Mr. Ortiz began gathering statements about Plaintiff from other employees at the EFO. Mr. Ortiz did this in response to Ms. Maciel lodging a complaint about Plaintiff regarding the April 19, 2016, verbal altercation. However, Ms. Maciel did not make this complaint until *one month* after the incident and only after Plaintiff complained of age discrimination. This delay in timing is made even more conspicuous by the fact that, just one or two weeks after the altercation, Ms. Maciel entrusted her young children to Plaintiff's care while she was away for a weekend. There was no credible evidence presented as to why Ms. Maciel would feel comfortable asking Plaintiff to take care of her children immediately after the altercation, but then felt the need to file a complaint regarding the altercation over a month later.

Finally, on July 21, 2016, Mr. Ortiz issued a formal Letter of Reprimand to Plaintiff in response to Ms. Maciel's complaint. But these three adverse employment actions—the revocation of Plaintiff's telework, the inexplicably delayed complaint and investigation regarding Plaintiff's conduct, and the Letter of Reprimand—were only the beginning.

From May 2016, when Plaintiff was not selected for the Project Manager position and contacted the EEO, to July 2018, when she was fired, Plaintiff and her managers at the Bureau were locked in an almost endless dispute. Plaintiff would assert claims of age discrimination, retaliation, and hostile work environment. Her managers ignored these claims and instead told Plaintiff that she was acting inappropriately, sending inappropriate emails, and treating her coworkers inappropriately. The evidence presented at trial showed that both sides had good reason to believe that they were correct. However, though Defendant was quick to investigate investigations **about** Plaintiff and used progressive discipline in

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 23

response, Defendant never effectively investigated the allegations **made by Plaintiff.**

For example, on August 25, 2016, Plaintiff filed her formal EEO complaint alleging age discrimination. However, by summer of 2017, the Bureau still had not initiated its investigation, even though EEO investigations are required to be completed within 180 days of the formal complaint. Unfortunately, in July 2017, Mr. Ortiz and another employee in the EFO passed away in unforeseen and unrelated accidents. But, because the EEO investigation had not yet begun, neither Mr. Ortiz nor the other employee were ever interviewed, despite them being directly involved in incidents related to Plaintiff's allegations of age discrimination. Plaintiff's EEO investigation finally commenced on August 9, 2017 and concluded on February 8, 2018—however, to this date, the investigation has not resulted in any conclusions or findings regarding Plaintiff's allegations.

In contrast, towards the end of July 2017, Plaintiff sent some emails in July 2017 regarding a work project that her managers thought were inappropriate. In one of these emails, Plaintiff reiterated her belief that she was being discriminated against based on her age. Mr. Lay immediately intervened to schedule a meeting with Plaintiff to address her inappropriate tone and asked her to submit all the emails she sent related to the work project. When Plaintiff did not submit these emails to Mr. Lay's satisfaction, he initiated disciplinary action. Specifically, by August 14, 2017, not even a month later, Mr. Lay was already working with Kip Stover, a supervisor in the Human Resources department, to draft a letter terminating Plaintiff's employment. This letter was subsequently downgraded to a 3-day suspension letter, which Mr. Lay gave to Plaintiff on September 17, 2017. Meanwhile, during this July-August 2017 time period, Plaintiff continued to complain of age discrimination and retaliation to both Mr. Lay and Lorri Lee, the Regional Director for the Bureau—yet no actions were taken to address Plaintiff's concerns.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 24

The disparity between Defendant's approach to investigating Plaintiff's allegations versus its approach to investigating allegations about Plaintiff is best highlighted by the events in the spring of 2018. On February 26, 2018, Karissa Fromm and Barb Gentry, two of Plaintiff's co-workers in the EFO, submitted hostile work environment complaints against Plaintiff to Mr. Stover. By March 8, 2018, just two weeks later, the Bureau had hired Hayward Reed, an outside private investigator, to investigate Ms. Fromm's and Ms. Gentry's complaints. Mr. Reed performed his investigation from March 14-15, 2018, specifically by interviewing witnesses and gathering affidavits. Mr. Reed then submitted his fact-finding report to Mr. Stover on March 28, 2018, which was then circulated to Plaintiff's managers by April 11, 2018. By May 14, 2018, Marc Maynard, the new Field Office Manager for the EFO who replaced Clint Wertz, issued a proposed removal letter for Plaintiff, which relied in part on the Hayward Reed investigation.

The evidence shows that Defendant was fully capable of initiating and completing an internal investigation into allegations of misconduct at the EFO. However, it did not do so for Plaintiff's complaints of age discrimination and retaliation. Instead, Defendant chose to draw a dividing line between the substance of Plaintiff's allegations and the tone that Plaintiff used to express these allegations, which Defendant believed to be inappropriate.[2]

---

[2] In fact, Defendant admitted as much in Plaintiff's proposed 3-day suspension letter. On page 4 of the letter, Mr. Lay wrote "I am proposing this [suspension] based upon the continued inappropriate manner in which you choose to voice your concerns. I am not prohibiting you from raising concerns. However, there are appropriate processes and forums to do so." Exhibit 605. But, when Plaintiff *tried* to raise her concerns through the "appropriate processes"—namely, by filing an EEO complaint—her complaint went uninvestigated.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 25

Defendant also, either willfully or carelessly, failed to recognize that Plaintiff's increased behavioral issues at work may have been borne out of its own inaction. As stated above, Plaintiff had never experienced any behavioral problems at work prior to her non-selection for the Project Manager position—in fact, she was celebrated and rewarded for her high-quality work. However, after her non-selection, Plaintiff reasonably believed that she had been discriminated against based on age and that she was being retaliated against for saying so. When Plaintiff tried to bring these complaints through the EEO process, her complaint fell into a black hole and languished—uninvestigated and uncompleted—for almost a year after she had filed it. Conversely, when Plaintiff tried to bring these complaints internally to her managers or to Human Resources, she was either told that her complaints were inappropriate and unfounded or that these complaints were more properly under the purview of the EEO process. But at no point did any manager at the Bureau work with Plaintiff to figure out and address the root cause of her behavior changes—instead, Defendant only focused on correcting and disciplining Plaintiff's behavior.

The Court recognizes that every employer has the right to manage and discipline its employees for inappropriate behavior. However, in the present case, Defendant's exercise of this right came at the expense of all its other responsibilities—including its duty to timely investigate and address allegations of discrimination/retaliation and to counsel employees on how to improve their performance before resorting to discipline. By abdicating these other responsibilities, Defendant institutionally failed its core tenet of providing a workplace free from discrimination and retaliation for employees like Plaintiff.

The Court concludes that Plaintiff has established that her protected activity was the but-for cause of her Letter of Reprimand. The evidence presented at trial showed that (1) Defendant learned that Plaintiff had contacted the EEO and (2) Defendant began subjecting Plaintiff to more negative treatment immediately after

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 26

learning this, which is circumstantial evidence of retaliation. *Yartzoff*, 809 F.2d at 1376. Additionally, Mr. Ortiz, when corresponding with Plaintiff about her telework status, even said: "Statements such as: 'Clint said he will not hire a female over 50 again' or 'Clint is building his harem' are negative and will not be acceptable. Any further negative statement of this type will be met with an official disciplinary action." Exhibit 33 at 2. This constitutes direct evidence of retaliation based on Plaintiff's allegations of age discrimination.

The Court also concludes that Plaintiff's protected activity was the but-for cause of her 3-day suspension. Though Plaintiff's July 2017 emails may not have been phrased in the most ideal or professional manner, she was trying to express her reasonably held concern that she was being removed from a project based on age discrimination and retaliation. *See Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021) (stating that a plaintiff need not "show that she was a perfect or model employee" to be protected under anti-discrimination laws). Defendant's 3-day suspension letter even acknowledged that Plaintiff was raising a concern, but—instead of addressing or investigating the concern—Defendant jumped to disciplining Plaintiff's inappropriate tone. In fact, Mr. Lay initially wanted to *terminate* Plaintiff based on these emails, even though Plaintiff had *no* documented behavioral or disciplinary issues in her file other than the July 2016 Letter of Reprimand.

Finally, the Court finds that, given Defendant's policy of progressive discipline, Plaintiff would not have been terminated from her employment in July 2018 had she not had the Letter of Reprimand and 3-day suspension in her file. But because these prior two disciplinary actions were retaliatory, the Court concludes that Defendant's retaliation was the but-for cause of Plaintiff's termination.

Accordingly, Plaintiff has successfully shown that Defendant retaliated against her in violation of the ADEA.

//

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 27

## C.     Remedies

Because Plaintiff has met her burden in showing that (1) age was the but-for cause of her non-selection for the Project Manager position and (2) that her protected activity was the but-for cause of Defendant's retaliation, Plaintiff is entitled to relief redressing the injuries stemming from these employment decisions.

Under the ADEA, a plaintiff can recover back pay in the form of unpaid minimum wages or unpaid overtime compensation. 29 U.S.C. § 626(b). If the plaintiff can show that reinstatement to her former position is not feasible, the plaintiff can also recover front pay. *Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1347 (9th Cir. 1987); *see also Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) ("In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of the discrimination, courts have ordered front pay as a substitute for reinstatement.").

However, an ADEA plaintiff cannot recover nonwage compensatory or punitive damages, such as damages for pain and suffering. *Naton v. Bank of Calif.*, 649 F.2d 691, 698 (9th Cir. 1981). Additionally, any damages award is subject to the plaintiff's duty to mitigate. *Cassino*, 817 F.2d at 1346-47 ("An ADEA plaintiff must attempt to mitigate damages by exercising reasonable care and diligence in seeking re-employment after termination.").

Here, Plaintiff presented testimony from Erick West, a forensic economist. Mr. West calculated that Plaintiff sustained the following economic damages from Defendant's violation:

- Back pay (including unpaid wages/benefits based on both (1) Plaintiff's non-selection for the Project Manager position and (2) Plaintiff's termination): **$352,117**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 28

- <u>Front pay</u> (including lost wages/benefits, pension, and student loan forgiveness): **$928,054**
- <u>Interest/taxes</u>: **$403,180**

The Court accepts Mr. West's calculations. The Court also finds that, due to ongoing hostility and psychological injury to Plaintiff based on Defendant's actions, reinstatement is not appropriate, and Plaintiff is instead entitled to front pay. Finally, the Court finds that Plaintiff mitigated her damages by exercising reasonable care and diligence in seeking re-employment after termination, even though she was ultimately unsuccessful in obtaining another position. Thus, the Court concludes that Plaintiff is entitled to $1,683,351 in monetary damages.

Plaintiff has also requested that the Court award injunctive relief, specifically to (1) strike the reasons for termination from Plaintiff's SF-50; and (2) remove all disciplinary letters from Plaintiff's file, including the Letter of Reprimand, the 3-day suspension, and the termination. The ADEA allows the Court to grant "equitable relief as may be appropriate to effectuate the purposes" of the statute. 29 U.S.C. § 626(b). Here, the Court finds that removing Plaintiff's disciplinary actions, which were tainted by age discrimination and retaliation, is necessary and appropriate to advance the purposes of the ADEA.

Accordingly, **IT IS HEREBY ORDERED:**

1. The District Court Clerk is directed to enter judgment in favor of Plaintiff.

2. The Court awards Plaintiff the following remedies:
   a. $1,683,351 in monetary damages;
   b. Removal of the reasons for termination in Plaintiff's SF-50;
   c. Removal of the letters of discipline in Plaintiff's file, including the (1) July 21, 2016 Letter of Reprimand; (2) the November 8, 2017 3-day suspension; and (3) the July 18, 2018 termination letter.

//

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 29

3.      Within **twenty-one (21) days** from the date of this Order, the parties shall submit briefing to the Court on the amounts of attorneys' fees and litigation costs. Plaintiff is directed to file affidavits and a memorandum setting forth the legal basis and justifications for any amount requested.

**IT IS SO ORDERED**. The District Court Clerk is hereby directed to enter this Order and to provide copies to counsel.

**DATED** this 12th day of April 2022.



Stanley A. Bastian
Chief United States District Judge

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 30

RE: *Kinnune v. State*
    **Cause No. 2:23-cv-00026-MKD**

# EXHIBIT 2

CASE NO. C19-1488 MJP

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT SEATTLE

# Kingston v. Int'l Bus. Machs. Corp.

Decided Jun 29, 2021

C19-1488 MJP

06-29-2021

SCOTT KINGSTON, Plaintiff, v. INTERNATIONAL BUSINESS MACHINES CORPORATION, Defendant.

Marsha J. Pechman, United States Senior District Judge

## ORDER ON PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND MOTION FOR INTEREST AND OFFSET FOR TAXES

Marsha J. Pechman, United States Senior District Judge

This matter comes before the Court on Plaintiff's Motion for Attorneys' Fees and Non-Taxable Costs (Dkt. No. 146) and Plaintiff's Motion for Prejudgment Interest, Offset for Taxes, and Post-Judgment Interest (Dkt. No. 142). Having reviewed the Motions, the Oppositions (Dkt. Nos. 156, 158), Replies (Dkt. No. 163, 166), and all supporting materials, the Court GRANTS in part Plaintiff's Motion for Attorneys' Fees and Non-Taxable Costs and GRANTS Plaintiff's Motion for Interest and an Offset for Taxes. *1

1

### BACKGROUND

On April 15, 2021, the jury returned a verdict in favor of Plaintiff Scott Kingston on all four of his claims against Defendant IBM. The jury found IBM liable for retaliation in violation of the Washington Law Against Discrimination, wrongful termination in violation of public policy regarding race discrimination and regarding the withholding of wages, and unjust enrichment

regarding unpaid commissions. (Dkt. No. 140.) The jury awarded Kingston damages as follows: (1) $1,874,302 for past economic loss; (2) $3,097,642 for future economic loss; (3) $113,728 for unpaid sales commissions; and (4) $6,000,000 for emotional harm. (*Id.*) Kingston now seeks an award of attorneys' fees and nontaxable costs, as well as both pre- and postjudgment interest and a tax offset.

### ANALYSIS

#### I. Motion for Attorneys' Fees and Nontaxable Expenses

##### A. Motion for Attorneys' Fees Standard

"The essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." *Fox v. Vice,* 563 U.S. 826, 838 (2011). To determine the fee award for a prevailing party, the Court begins by calculating a lodestar "by taking the number of hours reasonably expended on the litigation and multiplying it by a reasonable hourly rate." *Fischer v. SJB-P.D.* Inc., 214 F.3d 1115, 1119 (9th Cir. 2000) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983)); see *Ewing v. Glogowski,* 198 Wn.App. 515, 521 (2017) (accord under Washington law). "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley,* 461 U.S. at 435. And "[i]n these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id.*

Under federal law, the Court determines the hourly rate by considering the "evidence produced by the parties, including fee rates of other attorneys in

similar practices, awards in comparable cases, counsel's experience and reputation level, and the market rates, as well as two additional *Kerr* factors: the novelty/difficulty of the issues and the preclusion of other work." *Dang v. Cross, 422 F.3d 800, 814* (9th Cir. 2005). And under Washington law, if the "attorneys in question have an established rate for billing clients, that rate will likely be a reasonable rate." *Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597* (1983). But "[t]he attorney's usual fee is not, however, conclusively a reasonable fee and other factors may necessitate an adjustment, " such as "the level of skill required by the litigation, time limitations imposed on the litigation, the amount of the potential recovery, the attorney's reputation, and the undesirability of the case." *Id.* And "[t]he reasonable hourly rate should be computed for each attorney, and each attorney's hourly rate may well vary with each type of work involved in the litigation." *Id.*

In deciding the number of hours "reasonably expended, " the Court considers whether the time on matter that was "excessive, redundant, or otherwise unnecessary." *Hensley,* 461 U.S. at 434. The requesting attorney "must provide reasonable documentation of the work performed" to enable this determination. *Bowers,* 100 Wn.2d at 597; *Hensley,* 461 U.S. at 433 (accord). "This documentation need not be exhaustive or in minute detail, but must inform the court, in addition to the number of hours worked, of the type of work performed and the category of attorney who performed the work (i.e., senior partner, associate, etc.)." *Bowers,* 100 Wn.2d at 597.

## B. Prevailing Party

The Parties do not contest the fact that Kingston is the prevailing party on all of his claims. As such, Kingston is entitled to attorneys' fees and litigation expenses and costs under RCW 49.60.030(2) for his WLAD claim. And Kingston is similarly entitled to fees under RCW 49.48.030 for his

unjust enrichment and wrongful discharge claims. *See Dautel v. Heritage Home Ctr., Inc., 89 Wn.App. 148, 152-53* (1997); *Hayes v. Trulock, 51 Wn.App. 795, 806* (1988) (RCW 49.48.030 is broadly construed "to include back pay and front pay awards").

## C. Lodestar Calculation

Kingston requests approval of a lodestar of $1,337,553.75 in fees incurred through trial and an additional $129,693.75 in fees incurred through post-trial motions practice (a total of $1,467,247.50). The Court approves this request in part for the reasons set forth below.

## 1. Hourly Rates

IBM questions only the $375/hour rate of Jeremy Williams. IBM argues that Williams' rate cannot be reasonable when compared to the hourly rate of $325 charged by Brittany Glass, another attorney for Kingston who graduated from law school the same year as Williams. IBM's criticism misses the mark. The undisputed record before the Court indicates that an hourly rate between $325 and $375 is reasonable for attorneys of Williams's and Glass's experience practicing within this District particularly in employment cases. *(See* Declaration of Daniel Johnson ¶¶ 13-14 (Dkt. No. 147); Declaration of Jamal Whitehead ¶¶ 15, 17 (Dkt. No. 148); Declaration of Joseph Shaeffer ¶¶ 15-16 (Dkt. No. 149).) While Williams and Glass graduated from law school the same year, that does not compel a finding that they must bill at the same hourly rate. Both Williams and Glass possess different resumes and experiences and worked on different aspects of this case to different degrees. Williams had substantial experience litigating employment issues specific to IBM, which gave him a unique understanding of the factual landscape of this case. *(See* Declaration of Matthew Lee ¶ 24 (Dkt. No. 151).) The two attorneys also work for different firms, who chose to set their rates differently but within a range that is reasonable in this District. Based on what the Court observed of Williams'

performance, the Court finds that the rate requested for Williams is reasonable and within the range acceptable in this District.

The Court also finds that the other attorneys' and paralegals' requested hourly rates are reasonable given the Court's observation of the quality and skill of counsel, the contingent nature of the representation, the difficulty of the issues, and the evidence presented that the rates fall within the market rates in the District for employment cases such as this. *(See* Johnson Decl. ¶¶ 9-14; Whitehead Decl. ¶¶ 13-17; Shaeffer Decl. ¶¶ 14-16.) The Court notes that IBM has otherwise not challenged any of the requested rates.

### 2. Hours Expended

IBM asks the Court to reduce the number of hours Kingston's counsel billed to this matter for a variety of reasons. The Court reviews each critique.

### a. Litigation in New York

IBM asks the Court to reduce some of the hours Kingston's counsel billed when this case was initially filed in New York before he voluntarily dismissed it and refiled in this Court. IBM specifically asks for a reduction of $34,500 of the hours incurred to account for the fact that six of the seven claims that Kingston initially pursued in New York ultimately fell out the case. This includes four claims Kingston pursued under New York law and abandoned when he refiled in Washington, and two other claims that he pursued upon refiling that did not survive IBM's motion to dismiss. The Court is not convinced that this reduction makes sense. The claims Kingston filed in New York fell generally sought redress for his termination and unpaid commissions. Ultimately, he obtained relief and a substantial jury award on both fronts. So while Kingston voluntarily dismissed his claims based on New York law and had his contractual and statutory wage claims dismissed, he ultimately succeeded in obtaining all the relief he sought in his initial complaint. The

Court is not convinced that all of the time identified by IBM merits a reduction for the lack of success on individual claims that did not make it to trial, but for which Kingston ultimately obtained substantial monetary relief. *See Hensley,* 461 U.S. at 435.

But the Court does find some of the time Kingston spent trying to litigate the issue of venue in New York was both unsuccessful and unnecessary to the results achieved. *See Hensley,* 461 U.S. at 434. Having reviewed the billing records, the Court identifies 17.8 hours billed by Williams and 20.5 hours billed by Matthew Lee related to Kingston's opposition to the motion to dismiss which attacked venue, among other issues. The Court deducts from the lodestar half of this billed time (8.9 hours billed by Williams ($3,337.5) and 10.25 hours billed by Lee ($5,381.25)) to reflect the time that was unsuccessfully spent trying to keep the matter in New York. The Court otherwise makes no further reductions.

### b. Age Discrimination Claim

IBM asks the Court to reduce the amount of time Kingston's counsel billed related to his age discrimination claim that he dismissed on the eve of trial. The Court agrees that time billed exclusively to this claim should be deducted. IBM has identified only $1,435 billed to this claim. And IBM has otherwise failed to identify any other time billed that relates exclusively to the age discrimination claim, such as depositions, discovery, or motions. The Court is not convinced that any further reduction is appropriate. The facts and witnesses related to Kingston's age discrimination claim largely overlapped with those that took center stage at trial and which factored into the litigation. The Court will deduct the $1,435 billed from the lodestar specifically related to this claim, but nothing more.

### c. Motion to Dismiss

IBM asks the Court to reduce the hours Kingston's counsel spent opposing the motion to dismiss by 80% to reflect the fact that IBM obtained dismissal of 4 of 5 claims that it attacked. The Court finds no merit in this argument. While Kingston did lose out on his contractual and statutory wage claims, he preserved his equitable claims to unpaid wages and ultimately the jury awarded him the unpaid commissions. *See Hensley,* 461 U.S. at 435 ("[T]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.") The time spent on the motion to dismiss was not all in vain and it led to a narrowing and focusing of the issues-issues and claims on which Kingston succeeded. The Court will not reduce the hours IBM requests.

**d. Clerical Tasks, Excessive Time, and Travel Time**

IBM asks for a reduction for time spent on clerical tasks and "erroneous entries." Kingston agrees as to the erroneous entries, but only as to some of the purportedly clerical tasks that IBM has identified. Based on the Court's review of the billing records, it finds a reduction of 31.5 hours billed to clerical tasks and the erroneous entries to be appropriate (for a lodestar reduction of $5,552.50). The Court remains unconvinced that the other time entries IBM has identified relate only to "clerical tasks, " and makes no further reductions.

IBM also asks for a reduction of the hours spent by a paralegal at a deposition, and Kingston agrees with the request. The Court reduces the lodestar by $437.50.

IBM asks the Court to reduce the time billed by three attorneys at the deposition of Nick Donato. Although Williams took the deposition, both Toby Marshall and Lee appeared and billed time for the deposition. Particularly given Williams' experience, skill, and hourly rate, it was not necessary to have three attorneys' present. The Court therefore deducts the hour Lee billed (a reduction of $525 from the lodestar).

IBM asks the Court to reduce $23,850 billed for travel. The Court largely disagrees with this request. As IBM admits, the billing records generally show that counsel was working on this matter during the time billed for travel. The Court finds only one entry for 7.4 hours that was billed by Lee which shows exclusively travel time without substantive case work. The Court reduces the lodestar by 7.4 hours (or $3,885) and makes no further reduction for the hours billed related to travel.

**e. Focus Groups**

IBM asks the Court to reduce the hours billed by Kingston's counsel related to ten jury focus groups that Kingston convened. The Court agrees. While Kingston cites to other courts that have permitted recovery for this kind of work, the Court does not believe this time was well spent or necessary. Counsel for Kingston possess a great deal of experience and trial experience, which is reflected in their hourly rates. The Court does not believe that experienced counsel need to convene jury focus groups-much less ten focus groups-to be prepared for trial and convey their client's story. The Court finds that this time was neither reasonable nor necessary and that counsel's decision to spend this time and incur these costs will not be taxed to IBM. The Court therefore reduces the lodestar by the hours billed to the focus groups (178.65 hours totaling $70,023.75). The Court notes that it makes no reduction for time spent preparing to try this matter remotely via Zoom.

**3. Time Billed to Post-Trial Motions**

Kingston seeks an award for the time his counsel spent preparing the Motion for Attorneys' Fees, the Motion for Interest and Tax Offset, and opposing IBM's post-trial motion. *8 IBM does not oppose these requests, and the Court finds the time billed to be reasonable and necessary. Having reviewed the records presented, the Court finds the lodestar should include an additional $129,693.75 in fees for this work.

* * *

Including the time spent on the post-trial motions and the reductions identified above (which total $90,577.50), the Court finds that the total lodestar in this case is $1,376,670.00.

## C. Lodestar Multiplier

Kingston ask the Court to apply a multiplier of 1.5 to the lodestar to reflect the contingent nature of the success and the quality of work performed. IBM counters, arguing that this was merely a typical retaliation and employment case that posed no more risk than any similar case and that the contingency risk and quality of counsel is already reflected in the hourly rates. The Court finds that a multiplier here is appropriate.

A lodestar multiplier is governed here by Washington law. *See Rodriguez v. Cty. of Los Angeles,* 891 F.3d 776, 809 (9th Cir. 2018). "After the lodestar has been calculated, the court may consider adjusting the award to reflect additional factors." *Chuong Van Pham v. City of Seattle, Seattle City Light,* 159 Wn.2d 527, 541 (2007). Kingston bears the burden of justifying the upward adjustment. *See id.* Adjustments are made "under two broad categories: the contingent nature of success, and the quality of work performed." *Bowers,* 100 Wn.2d at 598. "The contingency adjustment is based on the notion that attorneys generally will not take high risk contingency cases, for which they risk no recovery at all for their services, unless they can receive a premium for taking that risk." *Van Pham,* 159 Wn.2d at 541. "[T]o the extent, if any, that the hourly rate underlying the lodestar fee comprehends an allowance for the contingent nature of the availability of fees, no further adjustment duplicating that allowance should be made." *Bowers,* 100 Wn.2d at 599. But "[w]hile we presume that the lodestar represents a *9 reasonable fee, occasionally a risk multiplier will be warranted because the lodestar figure does not adequately account for the high risk nature of a case." *Van Pham,* 159 Wn.2d at 542. The Court

must thus assess the likelihood of success at the outset of the litigation. *Bowers,* 100 Wn.2d at 598. And an adjustment for the quality of work performed "is an extremely limited basis for adjustment, because in virtually every case the quality of work will be reflected in the reasonable hourly rate." *Id.* at 599.

The Court here finds a multiplier to be appropriate. Looking at this case from its outset, Kingston's counsel took on a high-risk case where it would be difficult to prove that Kingston's termination was pretextual for acting as a whistleblower against racial discrimination and illegal wage withholding. This fact is tempered somewhat by the fact that Kingston was an attractive client-a high wage-earner who is articulate and knowledgeable. On balance, while some of this risk is reflected in the hourly rates of counsel that the Court has approved, not all of it is. And while the quality of counsel is largely reflected in the hourly rates, the exceptional result here merits some additional consideration. All three local attorneys providing declarations aver that the jury's award in this case was the largest in any retaliation, discrimination or wrongful termination case in the District. (Whitehead Decl. ¶ 18; Johnson Decl. ¶ 15; Shaeffer Decl. ¶ 13.) This success reflects the quality of counsel who succeeded in proving claims of retaliation largely with circumstantial evidence. Having considered these factors, the Court finds a multiplier of 1.1 appropriately reflects the high-risk nature of this case and counsel's quality of work.

Applying the multiplier, the Court awards $1,514,337.00 in attorneys' fees.

10 **D. Litigation Expenses** *10

The WLAD permits a prevailing party to recover the nontaxable costs of litigation. *Blair v. Wash. State Univ.,* 108 Wn.2d 558, 573 (1987); RCW 49.60.030(2). Here, the Court finds Kingston is entitled to recover all of the expenses he has identified except those related to the jury focus groups for the reasons set forth above. The Court

casetext

therefore awards $40,124.19 in nontaxable litigation expenses, which includes costs related to the post-trial motions ($236.25) and which deducts $39,900 in expenses related to the focus groups. The Court notes that it makes no reduction for expenses incurred to try this matter remotely via Zoom.

## II. Motion for Interest and Offset of Taxes

### A. Prejudgment Interest

State law governs the awards of prejudgment interest in this diversity action, so the Court considers Washington law as to prejudgment interest. *See Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.,* 513 F.3d 949, 961 (9th Cir. 2008). The first consideration is to determine what claims are liquidated, because prejudgment interest can only be applied to liquidated claims. *See Hansen v. Rothaus,* 107 Wn.2d 468, 473 (1986). Here, the parties do not dispute that Kingston's award for backpay and unpaid commissions are liquidated. The second consideration is the interest rate to be applied. Washington does not have a statute that sets a rate for prejudgment interest. Instead, Washington courts look to the statute governing post-judgment interest, RCW 4.56.110, to set the applicable rate. *See Unigard Ins. Co. v. Mut. of Enumclaw Ins. Co.,* 160 Wn.App. 912, 925 (2011) (prejudgment interest is allowed at the rates set by RCW 4.56.110). For WLAD claims, which sound in tort, courts use the interest rate determined by RCW 4.56.110(3). *Washington State Commc'n Access Project v. Regal Cinemas, Inc.,* 173 Wn.App. 174, 225 (2013). RCW 4.56.110(3)(b) provides that
11 "judgments founded on the tortious *11 conduct of individuals or other entities ... shall bear interest from the date of entry at two percentage points above the prime rate, as published by the board of governors of the federal reserve system on the first business day of the calendar month immediately preceding the date of entry."

Kingston asks for an award of prejudgment interest on his backpay and unpaid commissions at a rate of 2 percentage points over the prime rate to be applied to the jury's award of $1,710,018. That amount is found by adding together the unpaid wages of $1,682,334, employer-paid health benefits of $27,684, and unpaid commissions of $113,728. Kingston relies on Erick West, an economist, to calculate the prejudgment interest. West calculates the prejudgment interest for each month before judgment by using the applicable monthly prime rate plus 2 percentage points. *(See* Declaration of Erick West ¶¶ 8-15 (Dkt. No. 143); Reply Decl. of West ¶¶ 4-6 (Dkt. No. 164)). This results in a fluctuating interest rate. *(See* West Decl. ¶ 14.) Applying this fluctuating rate, West has determined that Kingston is entitled to a prejudgment interest award of $199,966.52.

IBM challenges Kingston's use of a fluctuating interest rate. Kingston responds by arguing that use of a fluctuating rate is permitted and encouraged under federal law and also consistent with state law. The Court agrees with Kingston. Considering federal claims, the Ninth Circuit has concluded that "[t]he most accurate way to fully compensate a plaintiff would be to award prejudgment interest from the date of injury, but at a fluctuating rate." *Saavedra v. Korean Air Lines Co.,* 93 F.3d 547, 555 (9th Cir. 1996). This reasoning applies equally to Kingston's state law claims because the purpose of prejudgment interest under both federal and Washington law claims is to fully compensate the plaintiff. *See id.*;
12 *Hansen,* 107 Wn.2d at 473. Here, the *12 application of a fluctuating interest rate, computed monthly is the most accurate and appropriate way to fully compensate Kingston.

IBM also argues that West has improperly compounded the interest calculations. But as West makes clear, he has not compounded the interest (i.e., added the accrued interest to the principal balance). *(See* Reply West Decl. ¶ 6.) West calculated prejudgment interest on a simple basis. The Court finds no flaw in this methodology.

casetext

The Court therefore awards $199,966.52 in prejudgment interest. *13

**B. Tax Offset**

Kingston requests $1,117,508 to offset the increased federal taxes he faces from to the jury's award for past and future economic loss and unpaid commissions.

The parties first dispute whether the award of a tax "gross up" or offset is discretionary. This requires the Court to assess the decision in *Blaney v. Int'l Assoc. of Machinists and Aerospace Workers, Dist. No. 160,* 151 Wn.2d 203 (2004). The opinion set out to answer the question of whether success on a WLAD claim "entitles [the] prevailing plaintiffs to an offset for the additional federal income tax consequences." *Id.* at 215. The Court concluded:

> Because WLAD incorporates remedies authorized by the federal civil rights act and that statute has been interpreted to provide the equitable remedy of offsetting additional federal income tax consequences of damage awards, we hold that WLAD allows offsets for additional federal income tax consequences.

*Id.* at 215-16. As this section makes clear, the WLAD merely "allows offsets" but does not require them. And because the offset is equitable in nature, it is within the Court's discretion to award the offset, if any. Ultimately, Kingston cites to no binding authority that a tax offset is mandatory, and the Court is not convinced that this view could be squared with the decision in *Blaney,* which merely spoke of an allowance for tax offsets, not a mandatory award. *14

The Court finds that a tax offset is appropriate in this matter. It is true that Kingston would have faced tax liability had IBM paid him the wages, benefits, and commissions that the jury awarded him. But due to IBM's conduct which the jury found improper under Washington law, Kingston was forced to litigate this matter to obtain these unpaid sums. Given the jury's verdict, the Court finds the equities favor IBM footing the bill for the substantial tax liability that Kingston faces from his successful jury verdict. The Court therefore awards the tax offset of $1,117,508-as that amount is calculated by West. *(See* West Decl. ¶¶ 16-26.)

**C. Post-judgment Interest**

Kingston asks for post-judgment interest to be awarded on his damages, as well as any prejudgment interest, attorneys' fees and costs, and that the post-judgment interest be calculated at a rate of .06%, computed daily and compounded annually. IBM agrees with this proposition. The Court therefore awards post-judgment interest on the awarded damages, prejudgment interest, and attorneys' fees and costs, to be calculated at a rate of .06% computed daily and compounded annually.

**CONCLUSION**

The jury's verdict in favor of Kingston was substantial, and his attorneys who pursued and obtained this result are entitled to recover their fees and nontaxable expenses, including a multiplier of the lodestar. The Court therefore GRANTS in part the Motion for Attorneys' Fees and awards $1,514,337.00 in attorneys' fees and $40,124.19 in nontaxable litigation expenses.

Kingston is also entitled to recover pre- and post-judgment interest, as well as a tax offset. The Court GRANTS the Motion for Interest and Tax Offset and Court awards prejudgment interest of $199,966.52, a tax offset of $1,117,508, and post-judgment interest on the awarded damages, prejudgment interest, and attorneys' fees and costs, to be calculated at a rate of .06% computed daily and compounded annually.

The clerk is ordered to provide copies of this order to all counsel. *15

Case 2:23-cv-00026-MKD    ECF No. 36    filed 10/12/23    PageID.212    Page 50 of 50

Kingston v. Int'l Bus. Machs. Corp.    CASE NO. C19-1488 MJP (W.D. Wash. Jun. 29, 2021)

